IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBIN M. GEARHART,<br>                  Plaintiff,<br><br>  vs.<br><br><br>CAROLYN W. COLVIN,[1]<br>Acting Commissioner of<br>Social Security Administration,<br>Defendant. | )<br>)<br>)<br>) Civil Action No. 12-1828<br>)<br>) Judge Mark R. Hornak<br>) Magistrate Judge Maureen P. Kelly<br>)<br>) Re: ECF Nos. 11, 13<br>) |

**REPORT AND RECOMMENDATION**

I.    **RECOMMENDATION**

It is respectfully submitted that the Motion for Summary Judgment filed by Plaintiff [ECF. No. 10] be denied. It is further recommended that the Motion for Summary Judgment filed by Defendant [ECF No. 13] be granted.

II.    **REPORT**

    A.    **Procedural History**

Plaintiff, Robin M. Gearhart ("Plaintiff"), brought this action pursuant to 42 U.S.C. § 405(g)), seeking review of the Commissioner of Social Security's final decision disallowing her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, 1381-1383f.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Defendant has consented to the substitution of Carolyn W. Colvin as the defendant in this suit. See also 42 U.S.C. § 405(g).

1

Plaintiff protectively filed this application for SSI on September 09, 2009, alleging disability since April 11, 2003, due to back problems, knee problems, anxiety/panic disorder, sleep apnea, depression, and auditory hallucinations. (R. 143, 148). This is Plaintiff's second application for SSI; her first application was filed on April 26, 2006, alleging she was disabled due to nearly identical conditions, absent allegations of auditory hallucinations and bipolar disorder. Plaintiff's initial application was denied after a hearing before an Administrative Law Judge ("ALJ") on June 16, 2008. The ALJ concluded that Plaintiff's allegations of physical and mental disability were not supported by her medical records, and that Plaintiff was fully capable of returning to employment at all exertional levels. (R. 24 – 32). Plaintiff sought judicial review of the decision which was affirmed by Order of Court dated January 3, 2012. Gearhart v. Commissioner, No. 10-765, ECF No. 14 (W.D. Pa. Jan. 3, 2012). Accordingly, because it has been judicially determined that Plaintiff was not disabled prior to June 16, 2008, the relevant period for Plaintiff's alleged disability in the instant action runs from October 2009 through June 9, 2011, the day of the ALJ decision at issue here.[2]

Plaintiff's second application for benefits was denied by Pennsylvania Bureau of Disability Determination on January 25, 2010; thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 6, 77).

A hearing was held on April 11, 2011, before Administrative Law Judge John Kooser ("the ALJ"). Plaintiff, who was represented by counsel, and Patricia J. Murphy, an impartial vocational expert ("VE"), testified at the hearing. (R. 34-74). Following the hearing, the ALJ issued his decision on June 9, 2011 (R. 10-20), finding:

---

[2] SSI is not payable prior to the month following the month in which Plaintiff filed her application. 20 C.F. R. § 416.335. Therefore, the relevant period begins in October 2009, the month following Plaintiff's second application for disability benefits. Evidence dated outside of the relevant time period has been considered to complete the Plaintiff's medical history consistent with 20 C.F.R. 416.912(d).

(1) Plaintiff has not engaged in substantial gainful activity since the amended onset date of September 9, 2009;

(2) Plaintiff has the severe combination of impairments of obesity with mild degenerative joint disease of the hips and knees and a Body Mass Index approaching 60, Asthma, Sleep Apnea, and Schizoaffective, Bipolar, Anxiety, Panic and Personality Disorders (20 CFR 419.920(c));

(3) Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404 Subpart P, Appendix 1;

(4) Plaintiff's impairments leave her with a residual functional capacity to perform less than a full range of light work; Plaintiff can lift and carry up to 10 lbs. frequently and up to 20 lbs. on occasion, she can alternately sit, stand and walk for the duration of an ordinary 8-hour workday, and she must be permitted to sit or stand at will in the performance of her duties; Plaintiff is limited to no more than occasional pushing/pulling, climbing ramps or stairs, and/or stooping; she must avoid hazards such as unprotected heights and moving machinery; Plaintiff is limited to simple, routine, repetitive tasks that are performed in a low stress environment with no complex decision making or high–volume production standards, and few changes in workplace setting, and no more than occasional interaction with supervisors/coworkers and no interaction with general public;

(5) Plaintiff is unable to perform any past relevant work;

(6) Plaintiff was 33 years old on the day of her application and is a younger individual;

(7) Plaintiff has at least a high school education and is able to communicate in English;

(8) Plaintiff is not disabled within the meaning of the Medical-Vocational Rules and so transferability of job skills is not material to decision;

(9) Considering Plaintiff's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform;

(10) Plaintiff has not been under a disability at any relevant time from the date of her benefits application.

Id.

Plaintiff exhausted all administrative remedies. On December 17, 2012, Plaintiff initiated this action seeking judicial review of the ALJ decision. (R. 1 – 3).

**B. Factual Background**

Plaintiff's testimony and medical records reveal a portrait of a mentally troubled young woman with some physical ailments related to mild arthritis and her morbid obesity.[3] The medical records and testimony submitted to the Court, however, substantially support the ALJ's determination that Plaintiff is not disabled.

### 1. Medical History

The relevant medical records show that Plaintiff began treatment at age 28 for "panic attacks" accompanied by hyperventilation. The attacks were successfully treated with a low dose of Paxil. (R. 257). Plaintiff stopped taking her medication while pregnant but felt well when she resumed Paxil in 2005. (R. 254). In April 2008, Plaintiff was assessed in conjunction with her application for SSI, and complained of anxiety, depression and panic disorder. However, Plaintiff had stopped taking Paxil, which was restarted with the clinical assessment that Plaintiff suffered from schizoaffective disorder with depression. (R. 248, 251).

Within a month of complying with her medication regimen, Plaintiff was having fewer panic episodes, but was started on Abilify to help with auditory hallucinations and depression. Her mood markedly improved and her records show that for period May 2008 through July 2008, Plaintiff's compliance with medication resulted in much improved moods, no panic attacks and no auditory hallucinations. (R. 245 – 7).

In November 2008, Plaintiff was seen by Jason Rock, M.D., at the Sharon Regional Behavioral Health Services clinic. Plaintiff displayed what would become a pattern of feeling worse when she failed to comply with prescribed medication management of her symptoms. She

---
[3] Plaintiff is 5'0" tall and her medical records show a weight range between 260+ to 326 lbs.

4

had been off her medication subsequent to the initial denial of benefits and was suffering increased panic attacks and auditory hallucinations. (R. 244). Plaintiff reported that she was not working and had applied for disability for mental health and orthopedic reasons. She stopped singing karaoke at her favorite bar, had a low appetite and was sleeping poorly. Plaintiff was also concerned that she might be pregnant. Plaintiff was diagnosed with schizoaffective disorder, depression and panic disorder.

By December 2008, Plaintiff was taking her Paxil and felt better. Plaintiff told Dr. Rock that she was not in therapy, and reported auditory hallucinations in the form of critical voices. Abilify was again added to Plaintiff's medication regimen and she continued to pursue her disability claim. It was determined that Plaintiff was not pregnant, had no other psychological issues and was not in any acute distress.

In January 2009, Plaintiff reported that she had a "good" Christmas holiday and was occasionally performing karaoke at a bar. She had surgery just before the holiday to remove a fatty deposit that troubled her. Plaintiff reported that she was pursuing a new application for disability benefits. Plaintiff also revealed that she had broken up with her boyfriend and was hearing critical voices, but had not sought therapy. She tolerated her medications without side effects and had no psychosis or mental health issues. A sleep aid was added to Plaintiff's medication regimen to help with sleep issues. Plaintiff was seen again in February 2009, and she reported the death of her grandfather. While Plaintiff remained somewhat depressed, the sleep aid was helping. The prescribed dosage of Paxil was increased to treat Plaintiff's depression. (R. 241 – 2).

Over the months that followed, Plaintiff was seen by her a primary care physician for the treatment of a genital skin disorder at least once a month. Plaintiff reported that she was

otherwise well, was trying to quit smoking and had mild intermittent abdominal pain. On September 3, 2009, Plaintiff was seen for intermittent numbness and tingling sensations in her arms and legs. Plaintiff did not know the cause and noted that changing position helped resolve her discomfort. She was tested to determine if the sensation was related to a metabolic disorder, such as diabetes. (R. 227 – 31, 369 – 70).

Plaintiff was not seen for mental health issues for the period February 2009 through October 26, 2009. She had "lots of no-shows" and had stopped taking her Abilify due to complaints of twitching. Plaintiff was drinking to intoxication once per week, and reported that she was suffering mood swings and depression. Plaintiff's provider indicated that she had "poor compliance" but had no acute risks were identified. Plaintiff was prescribed Paxil, Seroquel and a sleep aid. Plaintiff was diagnosed with schizoaffective disorder, depression, and panic disorder. (R. 240).

On October 27, 3009, Plaintiff was seen at UPMC Horizon at 5:00 a.m. She complained that after taking her first dose of Seroquel at 3:00 a.m. that morning, she was not able to lie down and was experiencing "pins and needles" and some pain on her right side. Plaintiff attributed her symptoms to ingesting the Seroquel and reported that she had been diagnosed with anxiety and bipolar disorders. (R. 390 – 394). However, Plaintiff also revealed that she was not sad or lonely and did not need to speak with anyone regarding her mental health. A CT scan of Plaintiff's head was ordered along with routine blood tests, and plaintiff was provided a low dose of Valium. All tests were negative for any abnormality and Plaintiff was discharged with a clinical impression of bipolar disorder. (R. 399 – 413).

On December 18, 2009, Plaintiff was seen by Joseph Kalik, D.O., for a medical examination in connection with a state agency disability determination. Plaintiff reported that

6

she had been diagnosed with bipolar disorder two months earlier (presumably in the UPMC Horizon emergency room) and recently had suffered from auditory hallucinations. (R. 261 – 264). She also complained of a long-standing history of asthma, back problems, knee problems, anxiety, panic disorder and sleep apnea.

Plaintiff's review of systems revealed that her asthma was well treated with an inhaler two to three times a week, and did not require the use of steroids. Plaintiff stated she had once sustained a "hairline fracture" of her hip; however, it was not treated surgically and resolved with the use of a cane for a time. With regard to Plaintiff's psychiatric history, she indicated that she was never hospitalized for mental health reasons, and was seen by a psychiatrist approximately once a month for a year and a half, but had not yet seen a therapist. Plaintiff stated that her current medication was Seroquel, which she started just two months prior to the exam. Id.

Plaintiff's physical examination was unremarkable with the exception of difficulty getting on and off the exam table due to her weight and "body habitus." She answered questions appropriately, and her short and long term memory appeared to be intact. Id. Plaintiff had a full range of motion with both her upper and lower extremities, but had somewhat decreased grip strength in her hands. In addition, Plaintiff's range of motion was somewhat decreased in both hips and knees due to weight but her muscle strength was +5/5. Plaintiff was able to crouch down and stand from a crouched position. Plaintiff also indicated that she could walk for approximately one-half mile before having to stop and that she could sit for five to ten minutes before shifting position. (R. 264).

Dr. Kalik's clinical impression included lumbar and knee pain, osteoarthritis, anxiety with panic attacks, bipolar disorder, sleep apnea and morbid obesity. However, he noted that Plaintiff did not present with any evidence of disc disease and that physical evaluation of her

7

knees was "essentially unremarkable" except for some decreased range of motion, "which could be attributable simply to body habitus." Id.

Plaintiff was seen at UPMC Horizon the following month, on January 7, 2010, for a slip and fall on ice, which resulted in a contused hip. X-rays of her hip and femur revealed no abnormalities and no significant degenerative arthritis. (R. 313 – 329).

Plaintiff returned to Sharon Regional Behavioral Health Services on January 18, 2010, three months after her last mental health related appointment. She reported that she had been on jury duty, and had a peaceful holiday. She had a new tattoo on her hand and was otherwise well, with no physical complaints and was tolerating her medication well. Plaintiff was not in therapy, but complained she was hearing critical voices at night. Her Seroquel dose was increased to address this complaint, but otherwise, Plaintiff was noted to be pleasant and doing well. (R. 340).

On January 19, 2010, Plaintiff was seen by Paul Fox, M.D., for a Physical Residual Functional Capacity Assessment, and three days later, on January 22, 2010, by Kerry Brace, Psy.D, for a Mental Residual Functional Capacity Assessment. Both examinations and the review of Plaintiff's medical records revealed that Plaintiff was neither physically nor mentally impaired so as to preclude employment. See, pp. 10-12, *infra*.

On April 5, 2010, Plaintiff was seen for mental health treatment, complaining of a marked increase in panic attacks, depression and critical auditory hallucinations. Plaintiff's medication was increased to treat each of her symptoms and she was referred to a therapist. (R. 341). Shortly thereafter, Plaintiff was seen by therapist Joyce Hart, LCSW, for the development of a treatment plan to manage her panic attacks, low moods and auditory hallucinations. The diagnostic impression included schizoaffective disorder and depression, and Plaintiff was to be seen for individual therapy once a month for four months. (R. 360 – 1, 349).

For the next six weeks, Plaintiff reported feeling much better, in a better mood, sleeping well, and not hearing voices. (R. 342). However, Plaintiff was seen on June 21, 2010, reporting an increase in panic attacks and auditory hallucinations, and again August 2, 2010, still feeling poorly, but related to being off her medication. (R. 344). Her medication was restarted. By October 2010, Plaintiff had lost her prescriptions and was again having increased panic and anxiety. (R. 347). Plaintiff was also diagnosed with diabetes on November 16, 2010. In addition, Plaintiff complained of back pain, but she was able to exercise in the course of babysitting for a friend two to three times a week.

Plaintiff's compliance with taking prescribed medication resulted in a return to feeling well and by the end of November 2010 she was not suffering from anxiety, panic attacks or auditory hallucinations. (R. 348). At a diabetes follow-up appointment in December 2010, Plaintiff revealed that she had not yet enrolled in a diabetic education program but was getting some exercise while helping a friend at a local bar. (R. 386). In March 2011, Plaintiff was again seen at UPMC Horizon complaining of bilateral hip and leg pain. (R. 414 – 418). No injury was noted, and x-rays revealed no fractures or dislocations and only mild degenerative arthritis in Plaintiff's hips and right knee. Plaintiff was discharged with instructions to take ibuprofen.

### 2. Functional Capacity Evaluations

On January 19, 2010, Paul Fox, M.D., performed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff. (R. 274 – 280). Dr. Fox concluded that Plaintiff suffered some limitations due to her obesity and asthma, based upon his review of Plaintiff's medical records, including her primary care provider's records, as well as the examination conducted by Joseph Kalik, D.O. These limitations include only occasional lifting to 20 pounds, frequent lifting to 10 pounds, standing and walking to 4 hours per day, sitting to 6 hours per day,

9

occasional climbing on ramps and stairs only, occasional balancing, stooping, and crouching, but no crawling or kneeling. Dr. Fox noted that Plaintiff is able to participate in daily activities such as caring for her personal needs and performing routine activities. She is able to relate well with others, and care for young children. Dr. Fox further considered the fact that Plaintiff has never sought or received treatment for alleged knee or back problems and that her asthma has been treated conservatively. Id.

Dr. Fox reviewed Plaintiff's medical records and determined that based upon the treatment provided, Plaintiff's statements regarding her physical symptoms and their effect on her ability to function are only partially credible. Further, Dr. Fox discounted the weight of Dr. Kalik's finding that Plaintiff was limited in standing and walking, because it was not supported by any medical history or by Plaintiff's own assessment that she was capable of walking one-half mile before stopping.

On January 22, 2010, Kerry Brace, Psy.D., completed a Mental Health Residual Functional Capacity Assessment of Plaintiff. (R. 281 – 297). Upon review of Plaintiff's medical records, Dr. Brace believed that the evidence supported finding impairments resulting from schizoaffective disorder and panic disorder without agoraphobia, with associated anxiety and panic attacks. However, these disorders resulted in only moderate difficulties with maintaining social functioning and interaction, concentration, persistence or pace, and only mild restrictions to activities of daily living with no repeated episodes of decompensation. Dr. Brace further found that Plaintiff "can perform simple, routine, repetitive work in a stable environment. She can understand, retain, and follow simple job instructions, i.e., perform one and two step tasks. She is capable of working within a work schedule and at a consistent pace. She would be able to maintain regular attendance and be punctual. Moreover, she would not require special

supervision in order to sustain a work routine. She could be expected to complete a normal workday without exacerbation of psychological symptoms. She is cable of asking simple questions and accepting instruction. She is self-sufficient. Also she can function in production oriented jobs requiring little independent decision making. Review of the medical evidence reveals that the claimant retains the abilities to manage the mental demands of many types of jobs not requiring complicated tasks." (R. 283). Accordingly, Dr. Brace found Plaintiff's statements concerning her abilities to be partially credible.

Dr. Brace's opinion was further supported by reference to Plaintiff's outpatient visit at UPMC Horizon in October 2009, where Plaintiff "was pleasant, in no apparent distress, had normal speech, with no psychotic symptoms." (R. 296).

Following the two RFC's in 2010, Plaintiff was evaluated on February 22, 2011, by her treating clinical social worker, Joyce Hart, LCSW, for purposes of completing a medical/mental assessment of Plaintiff's ability to do work-related activities. Ms. Hart indicated that Plaintiff suffers marked restrictions of activities of daily living, marked difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence and pace. Ms. Hart also indicated that Plaintiff satisfied the listing impairments for affective disorders and anxiety-related disorders, including a finding that Plaintiff suffered repeated episodes of decompensation, each of extended duration. (R. 331 – 337). However, Ms. Hart's report does not document any of the limitations or episodes of decompensation, and none are otherwise supported by medical findings or records in her report.

### 3. Testimony at ALJ Hearing

The hearing before the ALJ took place on April 11, 2011. Plaintiff testified that she was thirty-five years old, 5'1" and 260 pounds. (R. 40). Plaintiff is a high school graduate and took

post-secondary classes in cake decorating and to be a nurse's aide. (R. 44). She hasn't worked since 2002, having been laid off because of difficulty lifting. (R. 45). She also worked for two weeks in the late 1990's in the fast food industry. (R. 46). Plaintiff currently lives with her younger daughter, who is 6, and rents two rooms from her foster parents. She subsists on welfare and food stamps. (R. 43). Plaintiff testified she has a driver's license, and routinely drives to a nearby Wal-Mart and drives her daughter to school; however, she limits driving to short distances due to back pain. She once saw a chiropractor but her primary care physician doesn't believe in chiropractic treatment, so she treats her pain with ibuprofen. (R. 58). Plaintiff complained that her asthma required her to use an inhaler two to three times per day. Plaintiff also said she was recently treated for arthritis and bursitis and was prescribed Advil. (R. 39).

Plaintiff attributes her inability to work to panic brought on by being in a crowd, hearing voices, being diabetic and suffering from bipolar disorder. (R. 46). Plaintiff feels unable to get out of bed some days because of her depression. She does get up every day to change her clothes and bathe and does sleep at least eight hours a night. Her anxiety makes it difficult for her to be in a crowd, so she does her grocery shopping at night. Plaintiff doesn't have any other hobbies, and doesn't read, but spends her time watching television and movies. (R. 53 – 57).

Plaintiff testified that a typical day involved waking and doing laundry, trying to run a sweeper and cooking. Plaintiff also cares for her daughter, however there are some days her foster parents help her daughter dress for school and take her to the school bus. She limits her exercise to walking in her home and picking up toys, and she enjoys singing at home. Occasionally, Plaintiff will go to a nearby karaoke bar to sing. (R. 51 – 57).

Plaintiff states she has three panic attacks per week, which last for two to three hours, and sometimes all day. She also hears voices every twenty to thirty minutes, mostly at night. (R. 52,

60). Plaintiff sees Joyce Hart for therapy approximately once a month and takes her medication which helps "somewhat." (R. 52 – 53). Plaintiff believes that if she had a desk job, she would have an anxiety attack and need to lie down for one to two hours per day. (R. 60).

Following Plaintiff's testimony, the vocation expert testified briefly. The ALJ asked the vocation expert whether a hypothetical person of Plaintiff's age, educational, work experience and functional capacity would be able to perform any of Plaintiff's past work. The vocational expert testified that Plaintiff could not perform her past work, but that even with the requirement that she sit or stand at will, away from crowds and with infrequent contact with coworkers, in a low stress environment performing simple repetitive tasks with infrequent changes, Plaintiff could perform jobs such as a marker, with 155,000 positions available in the national economy; routing clerk, with 37,000 positions in the national economy; or an assembler of electrical accessories, with 23,000 positions in the national economy. Further, the vocational expert testified that the hypothetical person could be off task due to anxiety no more than 15 percent of expected work hours, and could miss no more than a few days of work each month, and that any greater absence would eliminate the identified positions. 9R. 69 – 72).

### C. Standard of Review

To be eligible for Social Security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d)(1)(A); Brewster v. Heckler, 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

13

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §§ 404.1520(a) (4), 416.920(a)(4); see Barnhart v. Thomas, 540 U.S. 20, 24–25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. Doak v. Heckler, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[4], 1383(c)(3);[5] Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. See 5 U.S.C. § 706. The district court must then

---

[4] Section 405(g) provides in pertinent part:
    Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business
42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:
    The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided i n section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.
42 U.S.C. § 1383(c)(3).

determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); Richardson, 402 U.S. at 390. When considering a case, a district court cannot conduct a de novo review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. Palmer v. Apfel, 995 F. Supp. 549, 552 (E.D.Pa. 1998); S.E.C. v. Chenery Corp., 332 U.S. 194, 196–97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. Chenery, 332 U.S. at 196–97. Further, "even where this court acting de novo might have reached a different conclusion ... so long as the agency's fact-finding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190–91 (3d. Cir. 1986).

**D.    Discussion**

Based upon the medical record in this case, the ALJ found at step two of the analysis, that Plaintiff experienced medically determinable severe impairments of obesity with mild degenerative joint disease of the hips and knees and a Body Mass Index approaching 60, Asthma, Sleep Apnea, and Schizoaffective, Bipolar, Anxiety, Panic and Personality Disorders. However, at step three, the ALJ determined that Plaintiff's physical limitations failed to meet any

15

Listing Criteria for disability. In addition, Plaintiff's allegations of mental impairment lacked sufficient evidentiary support to meet or medically equal the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1. At steps four and five, the ALJ determined Plaintiff's RFC and then determined that after taking into account her documented limitations, Plaintiff could not perform past work, but she is able to do other work available in the national economy.

Initially, it should be noted that in reviewing mental disorders, 29 C.F.R. Ch.111, Pt. 404, Subpt. P., App.1 section 12.00 provides that three analyses apply. First under the "A" criteria, the medical findings are evaluated. Second the "B" criteria impairment related functional limitations are considered and finally the additional criteria set forth in "C" are examined. In this regard we have examined Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

Listing 12.04 applies to affective disorders and requires a showing meeting the requirements of parts "A" and "B" or part "C". Part "A" requires a demonstration of a depressive syndrome with at least four of the following: anhedonia, appetite disturbance, sleep disturbance, psychomotor agitation or retardation, decreased energy, feeling of guilt or worthlessness, difficulty concentrating or thinking; thoughts of suicide or hallucinations, delusions or paranoid thinking. And, the part "B" requirements of at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace or repeated episodes of extended periods of decompensation. Finally, to satisfy the "C" requirement, a medically documented history of a chronic affective disorder of at least two years duration with repeated extensive episodes of decompensation or a residual disease process that had resulted in such marginal adjustments that any slight change in demands would result in further decompensation or a

16

history of more than one year's inability to function outside a highly supportive living arrangement.

Listing 12.06 concerns anxiety related disorders and requires that "A" it be the predominant disturbance which is medically documented with a demonstration of generalized persistent anxiety with at least three of the following four symptoms: motor tension, autonomic hyperactivity, apprehensive expectation or vigilance and scanning or a persistent irrational fear, or recurrent severe panic attacks or recurrent obsessions or compulsions or recurrent and intrusive recollections of a traumatic experience and "B" at least two of the following: marked restriction of activities of daily living, or marked difficulty maintaining social functioning or marked difficulties maintaining concentration, persistence or pace or repeated episodes of decompensation, or "C" a complete inability to function outside one's home.

Plaintiff objects to the ALJ decision, arguing that the ALJ erred when he failed to properly credit and give weight to the assessment of disability of Joyce Hart, LCSW, Plaintiff's treating therapist for the period April 2010 through April 2011, who determined that Plaintiff met the criteria for both Listings 12.04 and 12.06. Plaintiff also contends that the ALJ improperly failed to explain his decision not to accord Ms. Hart's opinion the weight it deserved. Plaintiff further finds fault with the ALJ's failure to credit Plaintiff's testimony regarding the extent of her periods of impairment and the failure to explain the reasons he found Plaintiff's testimony regarding her disability less credible.

The Court disagrees. With regard to Ms. Hart's opinions, it is well-settled that a "treating physician's opinion on the nature and severity of an impairment will be given controlling weight only where it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record." Salles v.

Comm'r of Soc. Sec., 229 Fed. App'x. 140, 148 (3d Cir. 2007); Horner v. Comm'r of Soc. Sec., No. 10-326-J, 2012 WL 895932 (W.D. Pa. Mar. 15, 2012).

Ms. Hart's February 2011 assessment opines that Plaintiff's affective disorders resulted in a fair or poor ability to function in a work setting, and that she suffered marked restrictions in her ability to function in daily living, socially and with regard to maintaining concentration, and additionally suffered repeated episodes of decompensation of extended duration. The ALJ considered this opinion, along with all of the other medical evidence and concluded that Ms. Hart's opinion was not well-supported by and was inconsistent with Plaintiff's record medical evidence of record.

The ALJ cited to contrary medical evidence in Plaintiff's ongoing treatment and progress notes, as well as records of other medical treatment sought throughout the relevant timeframe. The ALJ noted that even during a reported increase in her symptoms in April 2010, once Plaintiff's medication was adjusted and she was encouraged to "cut out pop and beer," within one month, Plaintiff reported well-being with no panic attacks, and that when panic attacks returned, she was "able to handle them." Similarly, after a period of being off of her medication for a variety of reasons (lost prescription, out of refills), upon resumption and compliance, Plaintiff reported "zero voices, zero anxiety, zero panic attacks. Eating and sleeping well." (R. 18). Also relevant were acknowledgements to Plaintiff's primary care provider that she was "watching a friend's kids 2 to 3 times per week and getting some exercise with that." The ALJ therefore explained that Ms. Hart's opinion was "excessively limiting in light of the treatment evidence of record." Id.

The ALJ concluded that a comprehensive review the medical records establishes Plaintiff's general well-being when she is compliant with her medication regimen, and that even

18

when not compliant, Plaintiff remains able to maintain herself and her daughter in a generally self-sufficient and independent fashion. Plaintiff maintains her finances, is able to drive, shop, and cook, attend to her daughter's needs admittedly with some assistance a few days a week, and clean and participate in household care and maintenance. (R. 14). In addition, the ALJ found Ms. Hart's opinion regarding social functioning is not supported by Plaintiff's ability to maintain friendships, have a boyfriend and custody of her young daughter, help a friend at a bar, and drive a friend to and from work, as well as occasionally sing karaoke at a bar. For similar reasons, the ALJ found Plaintiff's testimony regarding her limitations only partially credible and, for the most part, unsupported by her medical history.

As applied to Plaintiff, there is no doubt that she suffers from some degree of mental and physical limitation related to her obesity. However, the evidence demonstrates that she suffers only moderate impairment in daily living functions and that even with her moderate limitations, Plaintiff would be capable of performing light work in a low stress work environment. Under these circumstances, the vocational expert testified that there are a significant number of jobs in existence in the national economy that Plaintiff can engage. As a result, the ALJ issued a decision denying Plaintiff SSI benefits which is supported by substantial evidence.

Summary judgment is appropriate when there are no disputed material issues of fact, and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; <u>Edelman v. Commissioner of Social Sec.</u>, 83 F.3d 68, 70 (3d Cir. 1996). In the instant case, there are no material factual issues in dispute, and it appears that the ALJ's conclusion is supported by substantial evidence. For this reason, it is recommended that Plaintiff's Motion for Summary Judgment, ECF No. 10, be denied, that Defendant's Motion for Summary Judgment, ECF No. 13, be granted, and that the decision of the Commissioner be affirmed.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule 72.D.2, the parties are permitted to file written objections in accordance with the schedule established in the docket entry reflecting the filing of this Report and Recommendation. Failure to timely file objections will waive the right to appeal. <u>Brightwell v. Lehman</u>, 637 F.3d 187, 193 n. 7 (3d Cir. 2011). Any party opposing objections may file their response to the objections within fourteen (14) days thereafter in accordance with Local Civil Rule 72.D.2.

    Respectfully submitted,

    <u>/s/ Maureen P. Kelly</u>
    MAUREEN P. KELLY
    UNITED STATES MAGISTRATE JUDGE

Dated: October 8, 2013

cc: All Counsel of Record via CM/ECF